**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tonn Investments LLC, et al., | No. CV-19-00076-PHX-GMS |
| Plaintiffs, | **ORDER** |
| v. | |
| Joseph Shapiro, | |
| Defendant. | |

Pending before the Court is Plaintiffs' Motion for Summary Judgment (Doc. 45). For the reasons discussed below, Plaintiffs' motion is granted.

## BACKGROUND

Between 2012 and 2016, Scott Tonn, an investor, and his investment company Tonn Investments LLC (collectively, "Plaintiffs") extended multiple loans to Oncam Inc. ("Oncam"), a video technology corporation. (Doc. 51 at 1–2). At the time, Joseph Shapiro ("Defendant") was the Chairman and Chief Executive Officer of Oncam. (*Id.*). Mr. Tonn served as the President and Chief Operations Officer of Oncam. (*Id.* at 18).

During this period, Plaintiffs extended multiple secured loans to Oncam for millions of dollars (collectively, "Secured Loans"): a secured loan from Mr. Tonn ("Mr. Tonn Secured Loan"); a secured loan from Tonn LLC ("Tonn LLC Secured Loan); and a second secured loan held by Tonn LCC ("SunWize Secured Loan"). (*Id.* at 2, 4). One such asset was "a multi-terabyte hard drive" containing "portions of Oncam's source code" (the "Box"). (Doc. 46-2 at 10, 20).

Despite positive valuations and attempts to solicit investors, Oncam's technology "never reached its goals or plans, never launched a saleable product, and never generated any substantial revenue." (Doc. 45 at 2).

In 2017, after Oncam defaulted, Plaintiffs sued for nonpayment of the Secured Loans. (*Id.*). The parties ultimately entered a Settlement Agreement and Release ("Settlement Agreement"), which "modified and superseded all inconsistent terms and provisions set forth in the . . . secured loan agreements and obligations," and created "new, extended maturity dates and . . . revised interest rates." (*Id.* at 3–5). The parties further "acknowledged and confirmed the defaults and amounts owed." (*Id.* at 6). Plaintiffs also agreed "to continue a pending UCC sale and forbear on certain loan documents with Oncam" and to enter "a separate escrow agreement" ("Escrow Agreement") for the Box. (*Id.* at 7). The parties agreed that the Escrow Agreement would "govern the . . . possession, treatment, and disbursement of the" Box.[1] (Doc. 46-2 at 20).

Oncam again "failed to pay the amounts owed under the Settlement Agreement by the maturity dates." (Doc. 51 at 7).

In early January 2018, "Plaintiffs provided Oncam with written notice of its default." (*Id.*). Tonn LLC also "re-noticed a public UCC sale of all Oncam's property and assets," to take place on February 14, 2018, including a detailed description of the property to be sold:

> All assets, property, and interests of [Oncam], . . . including without limitation: all personal property of every kind and nature, including, without limitation, all goods (including, without limitation, all intellectual property, iOS and Android app code including source code, software development kit(s) . . . web-based code, server side code, and cloud development, including all source code(s), code files, . . . intellectual property rights, including but not limited to, all proprietary technology development code, patents, trademarks or otherwise . . . and all other assets, property, or interest in any and all property of [Oncam] whatsoever; but specifically EXCLUDING that certain intellectual property of [Oncam],

---

[1] Under the Escrow Agreement, the escrow agent's release of the Box to Plaintiffs "constitute[d] a deemed assignment . . . of all Intellectual Property Rights that [Defendant and Oncam] possess[] . . . with the full right and power of [Plaintiffs] to use, exploit, assign, and transfer the [Box] and all such Intellectual Property Rights therein as [Plaintiffs] may determine in [their] sole discretion." (Doc. 51-2 at 105).

- 2 -

including source code [located on the Box] . . . which is currently subject to that certain Escrow Agreement . . . .

(*Id.*). Two weeks before the scheduled sale, Tonn LLC published the notice in multiple publications of both local and nationwide circulation and in multiple courthouses. (*Id.* at 8; Doc. 46-6 at 1–12). Tonn LLC also issued a public press release announcing the sale, which reached hundreds of readers. (Doc. 51 at 8). No one reached out to Plaintiffs to inquire about the sale. (*Id.*).

The parties continued the sale after they began to negotiate amendments to the Settlement Agreement. (*Id.* at 9). By February 16, 2018, the parties entered into a First Amended and Restated Settlement Agreement and Release ("Restated Settlement Agreement"). (*Id.*). The Restated Settlement Agreement "modified and superseded all inconsistent terms and provision set forth in" the Settlement Agreement and prior loan documents, setting a new maturity date of March 30, 2018, with a UCC Sale to take place on April 2, 2018, in the event of default. (*Id.* at 9–10). Defendant and Oncam again "acknowledged and confirmed [the Secured Loan balances] that Oncam owed Plaintiffs." (*Id.* at 9). As with the Settlement Agreement, the Restated Settlement Agreement's terms included that Defendant "expressly waived . . . any and all defenses to payment under the Secured Loans for any reason and . . . any and all defenses, counterclaims, or offsets to the Secured Loans." (*Id.* at 10).

The parties contemporaneously entered a Guaranty. (*Id.* at 11). Under the Guaranty, Defendant agreed to act as the guarantor, with personal liability, for the Secured Loans until payment was made in full on both principal and accrued interest. (*Id.*).

In late March 2018, the parties entered an amendment to the Restated Settlement Agreement ("Amendment") which further continued the maturity date of the Secured Loans and the scheduled UCC Sale until July 2, 2018. (*Id.* at 12). Defendant agreed to pay a forbearance fee of $285,000.00 by the maturity date and "reaffirmed his existing personal guarantee of Oncam's full and complete performance with respect to the Secured Loans." (*Id.* at 13).

Defendant and Oncam again "failed to pay the outstanding balances owed on the Secured Loans, the Restated Settlement Agreement, and the Amendment by July 2, 2018." (*Id.* at 6, 13). Plaintiffs held the public UCC Sale on July 31, 2018. (*Id.* at 13). Defendant did not attend, nor did anyone other than Mr. Tonn, on behalf of Tonn LLC. (*Id.* at 13–14). Ultimately, Plaintiffs bid on and acquired the UCC Sale property, with proceeds of $145,000. (*Id.* at 14). The amount of Plaintiffs' bid was based on (1) the lack of interest from any other individual or entity in Oncam's assets; (2) Oncam's failure to generate any revenue for two years; (3) the outdated nature of Oncam's technology which was no longer competitive on the market; and (4) legal costs "that Oncam had incurred . . . in 2016." (*Id.*).

After the UCC Sale, Plaintiffs demanded that Defendant "pay all sums owed and remedy their default of the Restated Settlement Agreement, the Amendment, the Secured Loans, and the Guaranty" (collectively, Defendant's "Guaranteed Obligations"). (*Id.* at 15). Defendant did not respond but ultimately provided his express consent for the escrow agent to release the Box to Plaintiffs. (*Id.*).

In early 2019, Plaintiffs filed this lawsuit to recover the amounts owed to them for Defendant's alleged Breach of Guaranty. (Doc. 11). As of June 13, 2022, under the plain terms of his Guaranteed Obligations, Defendant owes Plaintiffs the following amounts: (1) $2,255,535.60 with $772.44 per diem interest on the Mr. Tonn Secured Loan; (2) $654,454.37 with $224.13 per diem interest on the Tonn LLC Secured Loan; (3) $4,148,939.29[2] with $4,092.10 per diem interest on the SunWize Secured Loan; and (4) the $285,000 forbearance fee, owed to Tonn LLC under the Amendment. (Doc. 46 at 10; Doc. 51 at 15–16).

Plaintiffs filed the instant Motion for Summary Judgment on June 14, 2022. (Doc. 45). The Court held oral argument on May 12, 2023, and took the motion under advisement. (Doc. 59). Within a matter of days, Defendant filed for Bankruptcy. (Doc. 60). The Court stayed these proceedings on July 13, 2023. (Doc. 62). On December 8, 2025, Plaintiffs notified the Court that Defendant's Bankruptcy case was dismissed (Doc.

---

[2] Plaintiffs' calculation of this amount factors in a reduction of $145,000 based on the UCC Sale proceeds. (Doc. 46 at 10).

- 4 -

74) and the Court lifted the stay (Doc. 75).

## DISCUSSION

### I. Defendant's Disclosure Obligations

#### A. Legal Standard: Mandatory Initial Discovery Pilot

Under the Amended Case Management Order (Doc. 41), the parties are bound to comply with the discovery procedures set out by the Mandatory Initial Discovery Pilot ("MIDP"). (Doc. 5 at 3–12). As relevant here, the MIDP establishes that the parties have a duty to disclose "the names and, if known, the addresses and telephone numbers of all persons who [the parties] believe are likely to have discoverable information relevant to any party's claims or defenses, and provide a fair description of the nature of the information each such person is believed to possess"; to disclose "the documents, [and] electronically stored information ("ESI") . . . known by [the parties] to exist, whether or not in [their] possession"; and for "each of [the parties'] claims or defenses, state the facts relevant to it and the legal theories upon which it is based." (*Id.* at 6–7).

Further, the MIDP clearly established that Rule 37(b)(2)—which governs a party's failure to comply with a court order regarding discovery—would apply to all mandatory discovery responses. (*Id.* at 4); Fed. R. Civ. P. 37(b)(2). The rule authorizes many sanctions, one of which is a preclusionary order, "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2)(A)(ii). "Preclusionary orders ensure that a party will not be able to profit from its own failure to comply." *United States v. Sumitomo Marine & Fire Ins. Co., Ltd.*, 617 F.2d 1365, 1369 (9th Cir. 1980) (quoting *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979)).

In both the original Case Management Order and the Amended Case Management Order, the Court clearly stated that "[p]arties who fail to timely disclose relevant information will be precluded from using it in the case." (Doc. 35 at 2 n.1; Doc. 41 at 2 n.1). As the Court has previously noted (Doc. 47), a "scheduling conference order is not a

frivolous piece of paper, idly entered, which can be cavalierly disregarded without peril." *Johnson v. Mammoth*, 975 F.2d 604, 610 (9th Cir. 1992).

Thus, the disclosures at issue here are governed by the MIDP which explicitly invokes Rule 37(b)(2). (Doc. 5 at 4). Unlike Rule 37(c)(1),[3] which requires the Court to provide the non-compliant party with "an opportunity to be heard" and only excludes evidence when the failure to disclose was not "substantially justified or harmless," Rule 37(b)(2) simply requires that the Court's use of the litany of sanction it provides is "just" and "specifically related to the particular 'claim' . . . at issue." *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982). District courts' discretion under Rule 37(b)(2) is broadest when a party's non-compliance is due to "willfulness, bad faith, or any fault" of that party. *Sumitomo*, 617 F.2d at 1369 (quoting *Societe Int'l Pour Participations Indus. et Com. v. Rogers*, 357 U.S. 197, 212 (1958)).

### B.   Application

Under the MIDP and Rule 37(b)(2), Defendant cannot use any evidence or any argument which Defendant did not disclose in compliance with the Court's Amended Case Management Order.[4]

From the beginning of this case, the Court repeatedly made it clear to the parties that it intends to enforce its deadlines and that parties who fail to comply with those deadlines will face the consequences. (Doc. 5 at 4; Doc. 35 at 2 n.1, 5; Doc. 41 at 2 n.1, 5). The Court warned the parties that failure "to timely disclose relevant information

---

[3] Plaintiffs' Reply in Support of Motion for Summary Judgment sets forth the standard for excluding evidence under Rule 37(c)(1), which requires exclusion unless the party's "failure [to disclose] was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). Rule 37(c)(1), however, only applies to disclosures of evidence made under 26(a) or (e). *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F.4th 458, 470–71 (9th Cir. 2024) (quoting *PCT Int'l v. Holland Elecs., LLC*, No. 12-CV-01797, 2015 WL 875200, at *5 (D. Ariz. Mar. 2, 2015)). As such, Rule 37(b)(2) applies here, rather than Rule 37(c)(1), because the MIPD "supersedes the disclosures required by Rule 26(a)(1)." (Doc. 5 at 3).

[4] This includes any attempt by Defendant to recharacterize evidence as expert testimony. (Doc. 52 at 4–6). Defendant never made any expert disclosures and much of the potential expert testimony that Plaintiffs identify is based entirely on *untimely* MIDP disclosures. (*Id.*). Regardless, the Court will not allow any use of evidence—even *timely* MIDP disclosures—to the extent that Defendant attempts to use such evidence as expert testimony.

[would] . . . preclude [the party] from using [that information] in the case," and that "unreasonably postpon[ing] disclosure of relevant information to the end of the discovery period" would subject the party to sanctions. (Doc. 35 at 2 n.1; Doc. 41 at 2 n.1).

When the parties made a good cause stipulation to extend a discovery deadline for the explicit purpose of conducting depositions (Doc. 40 at 1), the Court granted the stipulation. (Doc. 41 at 1). At that point, the Court explicitly advised the parties that "[t]here [would] be no further extensions." (*Id.*). Despite the Court's clear directive and prior warnings, on the day of the extended deadline for expert disclosures, Defendant again —this time without any good cause—moved the Court to amend its scheduling orders. (Doc. 42). The Court denied Defendant's motion. (Doc. 47).

Despite clear Orders and repeated warnings, Defendant now attempts to use his untimely disclosures in support of his asserted defenses. Defendant filed thirty exhibits (Doc. 51-1; Doc. 51-2; Doc. 51-3; Doc. 51-4) in support of his Response to Plaintiffs' Motion for Summary Judgment (Doc. 50) and his corresponding Statement of Facts (Doc. 51). While some of these exhibits contain evidence which was timely disclosed, many others are based on or contain evidence that was either untimely or never disclosed to Plaintiffs. For instance, Defendant attaches as Exhibits 7 and 28 the declarations of John Chiapetti (Doc. 51-2 at 90–92) and Ralph Garramone (Doc. 51-3 at 79–81). Both declarations are dated July 15, 2022, long after the April 15, 2022 discovery deadline. (Doc. 51-2 at 92; Doc. 51-3 at 81). Further, Chiapetti and Garramone were *never* disclosed as potential witnesses in this case. (*See* Doc. 52-1 at 67-68). Defendant's exhibits also include many pages of documents which he never disclosed. (Doc. 51-1 at 12–33, 84–89, 92–128; Doc. 51-3 at 46–64; Doc. 51-4 at 1–10).

In terms of untimely disclosures, Defendant attaches Exhibits 24, 25, 26, 27, and 29. Exhibits 24 and 25 consist of documents that Defendant only disclosed after the April 15, 2022 deadline. (Doc. 52-1 at 69). Exhibits 26, 27, and 29 are the declarations of Michael Hyman, dated July 15, 2022 (Doc. 51-3 at 40–45); Dylan Tinker, also dated July 15, 2022 (*id.* at 71–77); and James Loh, dated July 14, 2022 (*id.* at 83–86). Hyman's

declaration is further accompanied by exhibits which were either never disclosed (*id.* at 46–64) or untimely disclosed (*id.* at 66–69).

Defendant also provides his own declaration, dated July 15, 2022, as Exhibit 1 to his Response. (Doc. 51-1 at 2–14). The entirety of the declaration is based on information provided in its eleven accompanying exhibits, each of which were untimely disclosed (*id.* at 35–66, 68–83) or never disclosed (*id.* at 12–33, 84–89, 92–128).

Defendant's untimely disclosures to Plaintiffs on May 25, 2022, and May 27, 2022 (Doc. 52-1 at 48–64, 118–75), and his non-disclosures, were in clear violation of the Court's Order, which set the relevant discovery deadline for April 15, 2022. (Doc. 41 at 2). Defendant's use of the non-disclosed and untimely disclosure information in his Response further violates the scheduling order, which stated that parties would be precluded from using such information. (*Id.* at 2 n.1).

Given Defendant's willful and repeated failure to follow the Court's clear Orders and consistent warnings regarding the MIDP, the Court will not allow Defendant to rely on the evidence disclosed for the first time after the April 15, 2022 deadline (or not disclosed at all), which he presented for the first time in his Response, attempting to substantiate his defenses. Fed. R. Civ. P. 37(b)(2)(B)(iii); *see, e.g.*, *Ins. Corp. of Ireland*, 456 U.S. at 707–09 (holding that a court's sanction under Rule 37(b)(2) was both (1) "just" and (2) "specifically related to the particular 'claim'" where, (1) despite the court's repeated orders, warnings, and clear notice of consequences, the party acted in "obvious disregard" of the court, and (2) the sanction established facts which the non-complying party refused to produce in discovery, on an issue that it had raised). Nor will the Court allow Defendant's attempt to file his own declaration and its supporting exhibits to use evidence that was untimely or never disclosed.

Accordingly, the following summary judgment analysis will proceed without consideration of this evidence.[5]

---

[5] The background section above also excludes this evidence.

**II.     Motion for Summary Judgment**

    **A.     Legal Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. When considering motions for summary judgment, courts should construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in their favor. *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a material, factual dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Specifically, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Although the nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968), it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Consequently, "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

### B. Application

The parties agree that Arizona law governs Defendant's Guaranteed Obligations. (Doc. 46-9 at 27). Under Arizona law, Plaintiffs must prove "the existence of the contract, its breach, and the resulting damages." *Graham v. Asbury*, 540 P.2d 656, 657, 112 Ariz. 184, 185 (1975). There is no dispute regarding the existence of the Defendant's Guaranteed Obligations as defined by the Settlement Agreement, Restated Settlement Agreement, Guaranty, and Amendment. (Doc. 45 at 9; Doc. 51 at 4–5, 7, 9–13). Nor is there any dispute regarding Defendant's material breach of those agreements. (Doc. 45 at 9–10; Doc. 51 at 13).

What remains are Plaintiff's damages. The parties "do[] not dispute the amounts asserted as owed" under Defendant's Guaranteed Obligations. (Doc. 50 at 2; Doc. 51 at 13). Defendant argues, however, that the Court cannot grant summary judgment because there are genuine disputes of material fact regarding Plaintiffs' compliance with the Arizona Uniform Commercial Code ("AUCC"), which may affect the amount of Defendant's deficiency liability. (Doc. 50 at 9). Defendant's asserted defenses are that (1) Plaintiffs' calculation of Defendant's deficiency following the UCC Sale was incorrect; and (2) that Plaintiffs failed to conduct a commercially reasonable UCC Sale. (*Id.*). Plaintiffs contend that Defendant's express waiver of defenses in the agreements governing Defendant's Guaranteed Obligations bar his defenses here. (Doc. 45 at 9–10).

The Court will first consider the threshold issue of the effect of Defendant's waiver before discussing Defendant's asserted defenses.

#### 1. Effect of Waiver

As an initial matter, the express waiver in the agreements governing Defendant's Guaranteed Obligations does not render Defendant defenseless. The AUCC generally prohibits parties' waiver or variance of rule governing the "disposition of collateral," "the explanation" and "calculation of a deficiency or surplus when a disposition is made to the secured party," or "the secured party's . . . failure to comply with" the AUCC. A.R.S. § 47-9602(7)-(9), (13). The AUCC also, however, provides some exceptions to this prohibition.

*Id.* § 47-9624. One such exception, as relevant here, is waiver of the right to reasonable notice. *Id.* §§ 47-9611(B), -9624(A). "A debtor . . . may waive the right to [reasonable authenticated] notification of disposition of collateral . . . by an agreement to that effect entered into and authenticated after default." *Id.* § 47-9624(A).

In the Settlement Agreement, which was entered into by the parties after Defendant's initial default (Doc. 51 at 3–4), Defendant agreed to a provision which stated that Plaintiffs "reserve[d] their right to pursue immediately without notice of any kind, . . . their rights and remedies for all defaults." (Doc. 46-2 at 24). He further agreed to a specific "Waiver of Notice," which waived Defendant's "right, if any, to any future notice under th[e] Agreement," such that Plaintiffs had "no obligation to provide Oncam or [Defendant] with any notice prior to exercising any of their rights and remedies." (*Id.* at 25).

Accordingly, while Defendant may still assert both of his defenses—his deficiency calculation defense and his commercial reasonableness defense—Defendant has waived the right to reasonable notice by entering an agreement after default to that effect and, thus, cannot argue that the UCC Sale was commercially unreasonable on the basis of notice.

**2.      Deficiency Calculation**

"After default, a secured party may sell, lease, license or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." A.R.S. § 47-9610(A). Such disposition may include a public auction where the secured party purchases the collateral. *Id.* § 47-9610(C). After any proceeds from the sale have been used to pay reasonable expenses and satisfy any outstanding secured obligations, the secured creditor may be left with either a surplus or a deficiency. *Id.* § 47-9615(A), (D). Any surplus must be paid to the debtor. *Id.* § 47-9615 (D)(1).

On the other hand, the debtor remains "liable for any deficiency." *Id.* § 47-9615(D)(2). Deficiency is generally calculated using the actual net proceeds of the sale. *Id.* § 47-9615(A), (D). In cases where the secured creditor acquires the collateral at the

disposition, however, the calculation may change. *Id.* § 47-9615(F). If "[t]he amount of proceeds of the disposition is significantly below the range of proceeds that a complying disposition to a person other than the secured party[] [or] a person related to the secured party . . . would have brought," then "[t]he surplus or deficiency . . . is calculated based on the amount of proceeds that would have been realized" in the complying disposition. *Id.* The debtor—here, Defendant—bears "the burden of establishing that the amount of proceeds of the disposition is significantly below the range of prices that a complying disposition to a person other than the secured party[] [or] a person related to the secured party . . . would have brought." *Id.* § 47-9626(A)(5).

Defendant has failed to demonstrate a genuine issue of material fact with this defense. Though Defendant complains about the amount of proceeds from the UCC Sale, arguing that it is "significantly below the range of proceeds" for an AUCC-compliant disposition to someone other than Plaintiffs or someone associated with Plaintiffs, he does so without providing any evidence—or pointing to any evidence in the record—of what the "range of proceeds" might be for such a sale. (Doc. 50 at 14–16). His attempt to raise a material, factual dispute, relies entirely on evidence which he cannot use in this case. (*See id.*); *see, e.g.*, *Sumitomo*, 617 F.2d at 1369–70 (upholding a district court's preclusion order under Rule 37(b)(2), which resulted in a default judgment against the non-compliant party, even where there was no showing of bad faith or willfulness, because of the court's repeated warnings and prejudice to the other party). With no "factual data," *Taylor*, 880 F. 2d at 1045, or "specific facts," *Matsushita Elec. Indus.*, 475 U.S. at 587, to which a fact finder could compare the $145,000 of UCC Sale proceeds to determine whether it was "significantly below" the proper "range of proceeds," there is no factual dispute which could reasonably be resolved in Defendant's favor at trial. Accordingly, Defendant's arguments regarding this defense are not sufficient to defeat Plaintiffs' motion.

### 3. Commercial Reasonableness of UCC Sale

A debtor's deficiency liability will be limited or eliminated if the secured creditor failed to comply with the AUCC. A.R.S. § 47-9625(A). To comply with the AUCC's

rules governing disposition of collateral after default, "[e]very aspect of a disposition of collateral, including the method, manner, time, place and other terms, must be commercially reasonable." *Id.* § 47-9610(B).

The AUCC provides further insight into whether the *manner* of a collateral disposition is reasonable. First, "[t]he fact that a greater amount could have been obtained by . . . disposition . . . at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the . . . disposition . . . was made in a commercially reasonable manner." *Id.* § 47-9627(A). Second, a disposition will be considered commercially reasonable if "made: (1) [i]n the usual manner on any recognized market; (2) [a]t the price current in any recognized market at the time of the disposition; or (3) [o]therwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." *Id.* § 47-9627(B)(1)–(3).

Overall, "the determination of whether a particular sale is commercially reasonable depends upon the circumstances, and the decision is considered one of fact rather than law." *Gulf Homes, Inc. v. Goubeaux*, 602 P.2d 810, 813, 124 Ariz. 142, 145 (1979); *FL Receivables Trust 2002-A v. Ariz. Mills, LLC*, 281 P.3d 1028, 1041, 230 Ariz. 160, 173 (Ct. App. 2012) (holding that whether a secured creditor "has acted in a commercially reasonable manner . . . depends on various factors" specific to the context of the disposition).

The AUCC employs a burden-shifting framework to determine whether a sale is in compliance with the AUCC. First, "[a] secured party need not prove compliance with the [AUCC] . . . unless the debtor . . . places the secured party's compliance in issue." A.R.S. § 47-9626(A)(1). But once the issue is raised, "the secured party has the burden of establishing that the . . . disposition . . . was conducted in accordance with" the AUCC. *Id.* § 47-9626(A)(2).

If the secured creditor fails to prove that it complied with the AUCC, it may not be able to recover any deficiency from the debtor. *Id.* § 47-9625(A)(3)–(4). Indeed, a non-

compliant secured party can only recover if it proves that "the amount of proceeds that would have been realized" if the disposition complied with the AUCC would still have been less than "the sum of the secured obligation, expenses and attorney fees." *Id.* If the secured party does so prove, its deficiency will be calculated by subtracting "the sum of the secured obligation, expenses and attorney fees" from the greater of (a) the actual proceeds or (b) the amount of proceeds that should have been realized. *Id.*

Here, Defendant raises three arguments regarding Plaintiffs' AUCC compliance: (1) that the manner of Plaintiffs' UCC Sale was commercially unreasonable in the video technology industry; (2) that Plaintiffs' exclusion of the Box from the UCC Sale was commercially unreasonable; and (3) that Plaintiffs provided commercially unreasonable notice of the UCC Sale. (Doc. 50 at 10–13). As noted above, under A.R.S. § 47-9624(A), Defendant's waiver of the right to notice was effective, which is fatal to the third issue he attempts to raise. To defeat Plaintiff's motion for summary judgment, Defendant must place the commercial reasonableness of Plaintiffs' UCC Sale at issue by demonstrating a genuine issue of material fact. Each of Defendant's remaining arguments, which are addressed in turn below, fail to do so.

### a. Manner of UCC Sale

Defendant's first argument—that the manner of Plaintiffs' sale was not "in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition"—again depends entirely on evidence which he is not allowed to use in this case because of his failure to comply with the MIDP. (Doc. 50 at 10–11). Without "specific facts," *Matsushita Elec. Indus.*, 475 U.S. at 587, that illustrate the "industry norm" (Doc. 50 at 11), Defendant fails to demonstrate any material, factual dispute regarding the manner of the UCC Sale which a reasonable fact finder could resolve in his favor. In other words, because Defendant provides no evidence—and does not point to any existing evidence in the record—of the "typical process" for "market[ing] and s[elling]" similar "advanced video technology" (Doc. 50 at 11), his conclusory allegation that the UCC Sale did not comply with that "typical process" does not place Plaintiffs'

AUCC compliance at issue and cannot defeat Plaintiffs' motion for summary judgment.

### b. Plaintiffs' Exclusion of the Box

Defendant's second argument—that Plaintiff's exclusion of the Box from the UCC Sale rendered the sale commercially unreasonable—also fails to place Plaintiffs' AUCC compliance at issue or to demonstrate a genuine dispute of material fact. Defendant asserts that the material, factual disputes are: (1) whether the Box contained more than a mere copy of the source code, such that it had its own "substantial value," worth millions of dollars; and (2) that Plaintiffs' use of the Escrow Agreement to take title to the Box rendered the UCC Sale commercially unreasonable. (Doc. 50 at 11–13).

As to whether the Box contains a mere copy of the source code or has its own "substantial value," there is no genuine factual dispute. Both parties agree that the Box contains Oncam's source code[6] and that the UCC Sale included Oncam's source code. (*See* Doc. 46-2 at 10; Doc. 50 at 11–13; Doc. 51 at 21). In fact, Defendant never even suggests that anything other than Oncam's source code was stored on the Box. (*See* Doc. 50 at 11–13). Moreover, although Defendant insists that the Box had "substantial value" (Doc. 51 at 21), the value of the Box is the same as the value of the source code it contains,[7] and is therefore redundant with the value of the source code sold at the UCC Sale such that the inclusion of the Box would have been immaterial to the disposition of Oncam's property. Given that there is no genuine factual dispute over the contents of the Box or the value of those contents, there can be no genuine factual dispute over the Box's value.

Defendant's subsequent claim—that Plaintiffs' execution of the Escrow Agreement to take title to the Box in lieu of a public sale—is not material to whether the UCC Sale of Oncam's other property was commercially reasonable. Defendant challenges Plaintiffs'

---

[6] The Settlement Agreement describes the Box as "a multi-terabyte hard drive" containing "portions of Oncam's source code." (Doc. 46-2 at 10). Defendant himself contends that the information of value stored on the Box was the Oncam source code. (Doc. 51 at 21). And though Mr. Tonn lacked specific knowledge about the contents of the box, his understanding was that the Box contained a "backup" of intellectual property otherwise stored on "Oncam's cloud computers." (Doc. 50 at 12).

[7] Though Defendant's Response includes arguments about the value of the Box—and by proxy, the value of the source code—he again relies entirely upon evidence which he cannot use in this case. (Doc. 50 at 12).

conduct under subsections (A) and (C) of § 47-9610, which governs the disposition of collateral. (Doc. 50 at 13). As noted above, subsection (A) gives secured parties the right to "sell, lease, license or otherwise dispose of any or all of the collateral." A.R.S. § 47-9610(A). Subsection C allows a secured party to "purchase collateral . . . at a public disposition." *Id.* § 47-9610(C). The AUCC itself provides these rights to a secured party, but the rights also can be provided through an agreement of the parties. *Id.* § 47-9601(A). And though parties may not waive or vary certain rules governing the disposition of collateral, subsections (A) and (C) of § 47-9610 are not among those rules. *Id.* § 47-9602(7).

Here, the parties agreed that the Escrow Agreement would "govern the . . . possession, treatment, and disbursement of the" Box. (Doc. 46-2 at 20). The execution of the Escrow Agreement upon Defendant's default, and with his express consent, gave title to Plaintiffs, including "the full right and power . . . to use, exploit, assign, and transfer the [Box] and all such Intellectual Property Rights therein." (Doc. 51-2 at 105). Defendant protests Plaintiffs' execution of the agreement, arguing that Plaintiffs were required to dispose of the Box under subsection (A) and that Plaintiffs were only allowed to purchase the Box if they held a public sale under subsection (C). (Doc. 50 at 13). Subsection (C) does not apply because Plaintiffs did not "purchase" the Box; they took title to the Box according to the Escrow Agreement and Defendant's consent. A.R.S. § 47-9610(C). Subsection (A) provides methods by which a secured creditor may dispose of collateral but does not mandate a particular disposition for "any or all" collateral. *Id.* §§ 47-9610(A), -9602(7). Plaintiffs' alleged failure to comply with sections of the AUCC which did not apply to the transfer of the Box under the Escrow Agreement does not raise any material issue as to the commercial reasonableness of the UCC Sale of Oncam's other property.

In sum, though Defendant makes a conclusory assertion that the UCC Sale was commercially unreasonable, his arguments in support of this defense do not demonstrate that there is any genuine dispute of material fact as to the UCC Sale's commercial reasonableness. *Taylor*, 880 F.2d at 1045 ("A summary judgment motion cannot be

defeated by relying solely on conclusory allegations."). Defendant therefore fails to place Plaintiffs' compliance with the AUCC at issue to trigger the burden shifting provision of § 47-9626(A)(2) and, again, fails to demonstrate any material, factual dispute regarding the extent of his deficiency liability. As such, Defendant cannot defeat Plaintiff's motion.

## CONCLUSION

There are no genuine disputes of material fact as to the existence of the Guaranty between Plaintiffs and Defendant; Defendant's breach of that Guaranty; or the amount of damages that Plaintiffs suffered because of Defendant's breach. Plaintiffs, by a preponderance of the evidence, have thus proven all elements of their Breach of Guaranty claim, as required under Arizona law. *Graham*, 540 P.2d at 657, 112 Ariz. at 185. Accordingly, without any genuine, material, factual issues that a fact finder could reasonably resolve in Defendant's favor, Plaintiffs are entitled to judgment as a matter of law.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 45) is **GRANTED.**

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment in favor of Plaintiff Scott Tonn in the amount of $3,278,246.16[8] with $772.44 per diem post-judgment interest and in favor of Plaintiff Tonn Investments LLC in the amount of $10,803,082.18 with $4,316.23 per diem post-judgment interest. The Clerk shall terminate this action.

Dated this 27th day of January, 2026.

_____
G. Murray Snow
Senior United States District Judge

---

[8] Amount owed as of January 27, 2026, non-inclusive of per diem interest to accrue by the end of the day on January 27, 2026.